**Affirmed and Memorandum Opinion filed July 28, 2022.**



**In The**

# Fourteenth Court of Appeals

---

**NO. 14-20-00484-CV**

---

**CAROL SOUSA, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF ELIZABETH BETTY JEAN WILWERDING, DECEASED, Appellant**

**V.**

**GOLDSTEIN FAUCETT AND PREBEG, LLP; CP WINDUP, LLP F/K/A CLEARMAN PREBEG, LLP; PREBEG FAUCETT & ABBOTT, LLC; CHRISTOPHER FAUCETT, INDIVIDUALLY; STEPHEN ABBOTT, INDIVIDUALLY; MATTHEW PREBEG, INDIVIDUALLY; NEWTON SCHWARTZ, INDIVIDUALLY; AND NBS ACQUISITIONS CORP., Appellees**

---

**On Appeal from the 151st District Court**
**Harris County, Texas**
**Trial Court Cause No. 2016-77743**

---

**MEMORANDUM OPINION**

Appellant Carol Sousa, as personal representative of the estate of Elizabeth Betty Jean Wilwerding, deceased, asserts in five issues the trial court erred by compelling the parties to arbitration, confirming the arbitration award, and in

awarding attorney's fees to appellees Goldstein Faucett and Prebeg, LLP; CP Windup, LLP f/k/a Clearman Prebeg, LLP; Prebeg Faucett & Abbott, LLC; Christopher Faucett, individually; Stephen Abbott, individually; Matthew Prebeg, individually; Newton Schwartz, individually; and NBS Acquisitions Corp. (the IP attorneys). We affirm the judgment of the trial court.

## I.    BACKGROUND

Michael Wilwerding, formerly an inventor in Oregon, developed technology for processing or recycling waste rubber tires into hydrocarbon gas and solvent. He held several patents on his inventions. Wilwerding shared his intellectual property with several individuals and companies in Texas (Texas Licensees) through confidentiality and licensing agreements. However, after concluding that the Texas Licensees violated the agreements, Wilwerding cancelled the agreements. The Texas Licensees later filed several patent applications based on Wilwerding's intellectual property without Wilwerding's knowledge, and then made public Wilwerding's intellectual property after they formed a company to monetize the technology.

Wilwerding died in 2007. Shortly after his death, his widow, Betty, was approached by Keith Klinkhammer who had become interested in the Texas Licensees and their technology. After some research, Klinkhammer believed that Wilwerding was the true inventor. Klinkhammer explained his research to Betty and received power of attorney from Betty in December 2007, which granted Klinkhammer authority to make decisions regarding any claims arising from the use or misuse of Wilwerding's technology. Klinkhammer began looking for law firms to prosecute intellectual property claims under a contingency fee agreement. Klinkhammer was introduced to Newton Schwartz, an attorney and investor, by Clem Palmer, who was paid a finder's fee by Klinkhammer. Schwarz introduced

2

Klinkhammer to Christopher Faucett. At the time, Faucett practiced with the law firm Goldstein, Faucett & Prebeg and specialized in intellectual property enforcement and protection on a contingency-fee basis. Faucett flew up to Oregon to meet with Betty at her home to discuss a contingency-fee arrangement in January 2008. The contingency-fee agreement, signed by Betty, allowed the attorneys to split the contingency fee in any manner they felt appropriate so that they had the ability to retain local counsel if necessary.

In March 2008, Faucett and Schwarz filed suit against the Texas Licensees in federal district court in Oregon asserting claims of theft of trade secrets and breach of contract. Klinkhammer also learned that Wilwerding developed a prototype processor which the Texas Licensees had used to demonstrate their technology and secure funding. Wilwerding had taken the processor back from the Texas Licensees, but sold it to a company in Arkansas. Because the Arkansas company that purchased the processor allegedly threatened to sue Wilwerding's estate for breach of contract, the attorneys settled these claims and purchased the processor for $90,000 with the intent the settlement would be considered a cost under the contingency-fee agreement. Sousa asserts that Newton Schwarz committed insurance fraud with respect to the processor and inappropriately claimed the settlement as a litigation expense.

In 2009, one of the Texas Licensees settled the trade-secret claims against him. Due to a bankruptcy filing, the remainder of the trade-secret lawsuit was stayed from November 2009 to April 2011.

In 2011, Betty's health began deteriorating and her daughter, Carol Sousa, became involved with her mother's affairs. Sousa was concerned her mother had been taken advantage of by Klinkhammer, Faucett, and Schwarz. She received a power of attorney from her mother and retained attorneys Dan and Penelope

3

McCarthy in Oregon to represent her with respect to her mother's affairs. The McCarthys began evaluating the contingency-fee agreement and requesting documents from the involved parties. Faucett, practicing then with the firm of Clearman Prebeg, LLP n/k/a CP Windup,[1] was aware that Sousa had concerns about the treatment of her mother and the contingency-fee agreement. Faucett advised Sousa's attorneys that he would not continue representing Betty until he received confirmation that Betty's daughter and her counsel were in agreement with the contingency-fee agreement and representation by Faucett and Schwarz. Sousa, through Dan McCarthy, approved and ratified the contingency-fee agreement in a December 2011 email, which stated that Sousa supported "all efforts by all persons to date."

In 2012, Faucett and Schwarz renegotiated the prior settlement to expand the use of Wilwerding's technology into Canada. The amended settlement agreement resulted in an initial settlement payment of $100,000. Despite having approximately $200,000 in expenses, the IP attorneys agreed to take $20,000 of this settlement payment for expenses so Betty would receive the benefit of the settlement proceeds. This settlement agreement was executed by Sousa, as Betty's conservator, in March 2012.

Betty died in June 2012. After her death, Sousa hired another attorney to dispute the contingency-fee agreement. After Faucett requested to have the claims arbitrated, Dan McCarthy got involved and apologized for any confusion and reaffirmed Sousa's support and agreement with the work of the IP attorneys. Shortly thereafter, Faucett and Schwarz settled with the remaining Texas Licensees. Under the terms of this final settlement agreement, the remaining Texas

---

[1] In 2010, Goldstein, Faucett & Prebeg ceased operating and Faucett joined Clearman Prebeg, LLP.

Licensees would pay a total of $700,000 over the course of seven years. The trade secret litigation was resolved and dismissed in 2012.

Faucett and Schwarz proposed a distribution agreement to Betty's estate to address the distribution of all the settlement proceeds that was intended to resolve any dispute by Sousa. Sousa agreed to the Distribution Agreement, though she communicated to the McCarthys that she entered into the agreement with the intent to later sue Faucett and Schwarz and file state bar grievances against them.

Sousa later retained David Sheller, her trial counsel in this proceeding. On behalf of Sousa as personal representative of the estate, Sheller filed the underlying suit in 2016 asserting causes of action for barratry pursuant to Government Code section 82.065, Deceptive Trade Practices-Consumer Protection Act violations, breach of fiduciary duty and conspiracy, as well as negligence and negligent misrepresentation against: Faucett, individually; Goldstein Faucett and Prebeg, LLP; Prebeg Faucett & Abbott, LLC; CP Windup[2]; Newton Schwarz, individually; and NBS Acquisitions, Corp. arising out of the contingency fee agreement and Faucett and Schwarz's representation of Betty. The IP lawyers sought to have the case referred to arbitration, which the trial court ordered in April 2017.

After further disputes including an interlocutory appeal to this court[3], Sousa

---

[2] Scott Clearman intervened in the suit arguing that Clearman Prebeg, LLP ceased to exist in March 2016, prior to Sousa's suit and therefore should not be a party. Clearman was not named in Sousa's petition, but was one of four former partners in Clearman Prebeg, LLP and intervened to protect his interest. Clearman also argued that counsel for the IP attorneys had no authority to represent Clearman Prebeg, LLP. The IP attorneys disputed Clearman's contentions, including his assertion that Clearman Prebeg, LLP no longer existed. Ultimately, Clearman nonsuited his claims and Clearman Prebeg, LLP was thereafter referred to as CP Windup.

[3] This court dismissed Sousa's appeal concluding that it had no jurisdiction over an appeal of an order granting a motion to compel arbitration. *Estate of Wilwerding v. Faucett*, No. 14-17-00350-CV, 2017 WL 2701097, at *1 (Tex. App.—Houston [14th Dist.] June 22, 2017, no pet.) (mem; op.). Subsequently, Sousa filed a petition for writ of mandamus asking this court to compel the trial court to vacate its order compelling arbitration of all Sousa's claims. *In*

initiated arbitration through the American Arbitration Association (AAA), specified in the contingency-fee agreement, and requested the Hon. Alice Oliver-Parrott as the arbitrator. The IP attorneys ultimately agreed. In the arbitration, Sousa expanded the scope of her claims against the IP attorneys to include: (1) barratry and violations of the Government Code section 82.065; (2) negligent hiring and supervision; (3) violations of the Deceptive Trade Practices-Consumer Protection Act[4]; (4) breach of fiduciary duty and conspiracy; (5) negligent misrepresentation and negligence; (6) professional misconduct under Texas Disciplinary Rules of Professional Conduct 8.03 and 8.04;[5] (7) violations of the Texas Theft Liability Act[6]; (8) insurance fraud and breach of fiduciary duty; and (9) declaratory judgment that the contingency-fee agreement is null and void. After Oliver-Parrott ruled on several motions, appellant sought dismissal of Oliver-Parrott for displaying evident partiality. Sousa filed a motion in the trial court seeking Oliver-Parrott's removal as arbitrator. Though the trial court denied Sousa's motion, Oliver-Parrott recused herself as an arbitrator citing the "extreme mendacity" of Sheller.

The AAA then initiated the process of selecting another arbitrator, which

---

*re Estate of Wilwerding*, No. 14-17-00361-CV, 2017 WL 2218974, at *1 (Tex. App.—Houston [14th Dist.] May 18, 2017, orig. proceeding). This court denied the petition for writ of mandamus because Sousa did not establish that she lacked an adequate remedy by appeal. *Id.*

[4] The Deceptive Trade Practice-Consumer Protection Act (DTPA) is Business and Commerce Code chapter 17, covering sections 17.01–17.955. Tex. Bus. & Com. Code Ann. § 17.41.

[5] Though Sousa alleges the IP attorneys violated the Texas Disciplinary Rules of Professional Conduct, the rules do not create a private cause of action. The preamble to the rules of professional conduct states: "Violation of a rule does not give rise to a private cause of action nor does it create any presumption that a legal duty to a client has been breached." Tex. Rules Prof'l Conduct P. Preamble ¶ 15, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A (Tex. State Bar R. art. X, § 9).

[6] The Texas Theft Liability Act (TTLA) is Civil Practice and Remedies Code chapter 134, covering sections 134.001–134.005. Tex. Civ. Prac. & Rem. Code Ann. § 134.001.

6

resulted in the appointment of Edward "Trey" Bergman. During the confirmation process, Bergman initially disclosed that he had previously mediated matters with various attorneys at the firm of Wilson Elser Moskowitz Edleman & Dicker LLP (Wilson Elser), including one mediation with John Shepperd, a partner at Wilson Elser and the lawyer representing the IP attorneys with respect to Sousa's claims. After a request for further disclosure from Sousa, Bergman disclosed that he had served as a mediator for eleven cases involving attorneys from the firm of Wilson Elser between 2006 and 2019. Sousa objected to Bergman serving as the arbitrator, but after briefing by the parties the AAA overruled Sousa's objections and reconfirmed Bergman in May 2019.[7]

A final hearing in the arbitration proceeding was held in October 2019. Bergman issued an award in March 2020 finding that Sousa did not prove any of her claims against the IP attorneys and concluding Sousa should take nothing by way of her claims. Bergman also found that the CP Windup, Schwartz, and NBS Acquisitions successfully proved their counterclaims against Sousa and assessed attorney's fees against her, as well as costs and expenses pursuant to AAA rules. The IP attorneys sought to have the trial court confirm the arbitration award. Sousa objected to confirmation of the arbitration award because of corruption and evident partiality. The trial court confirmed the award on the submission of the parties' motions and rendered a final take-nothing judgment against Sousa on May 4, 2020.[8] Sousa appeals the final judgment of the trial court.

---

[7] Sousa also filed a petition for writ of mandamus asking this court to compel the trial court to strike Bergman for evident partiality and hold an evidentiary hearing concerning Betty's capacity to sign the contract at issue and whether the contract is void This court denied the petition for writ of mandamus. *In re Estate Wilwerding*, No. 14-19-0042-CV, 2019 WL 2385749 (Tex. App.—Houston [14th Dist.] June 6, 2019, orig. proceeding [mand. denied]).

[8] The language used by the trial court in the final judgment reflects the intent to "unequivocally" and "expressly dispose[] of all claims and all parties." *Lehmann v. Har-Con*

## II.    ANALYSIS

## A.    Trial court did not err in compelling arbitration

We begin with issue 2, in which appellant argues that the trial court erred in referring the case to arbitration because there was no evidentiary hearing or discovery allowed on Betty's capacity to contract in 2007. Sousa relies on Civil Practice and Remedies Code section 171.022 urging referral to arbitration was "procedurally unconscionable because Betty was not competent to sign the contract." *See* Tex. Civ. Prac. & Rem. Code Ann. § 171.022 ("A court may not enforce an agreement to arbitrate if the court finds the agreement was unconscionable at the time the agreement was made."). Sousa also argues there was no discovery on the issue of the forced ratification by Sousa of the contingency-fee contract.

We need not address the substance of the dispute between the parties over Betty's competence. Because the record established that Sousa ratified the contingency-fee contract, the trial court did not need to hold an evidentiary hearing on Betty's competence or decide Betty's competence.

### 1.    Standard of review

We review a trial court's decision to grant or deny a motion to compel arbitration for an abuse of discretion. *See Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 271 (Tex. 1992). Under an abuse-of-discretion standard, we defer to the trial court's factual determinations if they are supported by evidence, but we review the trial court's legal determinations de novo. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009). Whether an arbitration agreement is enforceable is subject to de novo review. *Id*.

---

*Corp.*, 39 S.W.3d 191, 192–93, 200 (Tex. 2001).

Because the trial court here did not enter specific findings of fact or conclusions of law to explain its granting of the motion to compel arbitration, we must uphold the trial court's decision on any appropriate legal theory urged below. *Shamrock Foods Co. v. Munn & Assocs., Ltd.*, 392 S.W.3d 839, 844 (Tex. App.—Texarkana 2013, no pet.); *In re Weeks Marine, Inc.*, 242 S.W.3d 849, 854 (Tex. App.—Houston [14th Dist.] 2007, orig. proceeding).

### 2.    Governing law

The contingency-fee agreement does not specifically invoke either the Federal Arbitration Act[9] (FAA) or the Texas General Arbitration Act[10] (TAA) but provides that it shall be governed by the laws of Texas. Accordingly, both the FAA and TAA apply. *Natgasoline LLC v. Refractory Constr. Servs., Co. LLC*, 566 S.W.3d 871, 878 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) ("If an arbitration agreement does not specify whether the FAA or the TAA applies, but states that it is governed by the laws of Texas, both the FAA and the TAA apply unless the agreement specifically excludes federal law."); *see also Accord Bus. Funding, LLC v. Ellis*, 625 S.W.3d 612, 617 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (same). The issue of arbitrability, however, is subject to the same analysis under either statute. *Rodriguez v. Texas Leaguer Brewing Co.*, 586 S.W.3d 423, 427 (Tex. App.—Houston [14th Dist.] 2019, pet. denied).

### 3.    Compelling arbitration

Generally, a party seeking to compel arbitration must establish that a valid arbitration agreement exists and that the claims at issue fall within the scope of that agreement. *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 524 (Tex. 2015). Once an arbitration movant meets that burden, a trial court must grant

---

[9] *See* 9 U.S.C. §§ 1–16.

[10] *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 171.001–.098.

the motion to compel arbitration unless the opposing party proves a defense to arbitration. *Rodriguez*, 586 S.W.3d at 428. We apply state contract principles to determine whether a valid arbitration agreement exists. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227–28 (Tex. 2003).

The supreme court has concluded that the issue of mental incapacity is for the court to decide rather than the arbitrator, because it is a formation defense calling into question the very existence of a contract. *In re Morgan Stanley & Co.*, 293 S.W.3d 182, 189–90 (Tex. 2009) (orig. proceeding). Texas law presumes that a person executing a contract or instrument had sufficient mental capacity at the time of its execution to understand her legal rights. *Bradshaw v. Naumann,* 528 S.W.2d 869, 873 (Tex. Civ. App.—Austin 1975, writ dism'd); *see Hall v. Hall,* 352 S.W.2d 765, 767 (Tex. Civ. App.—Houston 1962, no writ) (mental capacity to contract must be determined as of contract execution date). Accordingly, the burden rests on the person seeking to set aside a contract or instrument to show lack of mental capacity of the contracting party at the time the contract or instrument was made. *Bradshaw,* 528 S.W.2d at 873.

To establish lack of mental capacity to contract in Texas, the evidence must show that, at the time of contracting, the person could not have "appreciated the effect of what [she] was doing and understood the nature and consequences of [her] acts and the business [she] was transacting." *Mandell & Wright v. Thomas*, 441 S.W.2d 841, 845 (Tex. 1969); *see Bach v. Hudson*, 596 S.W.2d 673, 675–76 (Tex. Civ. App.—Corpus Christi 1980, no writ). As a general rule, the question of whether a person, at the time of contracting, knows or understands the nature and consequences of her actions is a question of fact. *See Fox v. Lewis*, 344 S.W.2d 731, 739 (Tex. Civ. App.—Austin 1961, writ ref'd n.r.e.).

## 4. Necessity of an evidentiary hearing

Sousa argues that the trial court erred by not holding an evidentiary hearing on Betty's capacity to contract in 2007. When a party opposing an application or motion to compel arbitration denies the existence of an agreement, the trial court shall "summarily determine that issue." Tex. Civ. Prac. & Rem. Code Ann. § 171.021(b). In the context of enforcing an arbitration clause, the supreme court has defined the contours of a summary determination:

> Ordinarily, contested issues are decided after a plenary hearing, that is, a hearing at which witnesses present sworn testimony in person or by deposition rather than by affidavit. For example, our rules permit trial courts to render final judgments in civil cases on motions for summary judgment. A trial court may render a summary judgment based on a record consisting of deposition transcripts, interrogatory answers, and other discovery responses, along with the pleadings, admissions, affidavits, stipulations, and authenticated or certified public records before the court at the time the motion is heard. Tex. R. Civ. P. 166a(c). This procedure, as the title suggests, is summary in nature.

*Jack B. Anglin Co.*, 842 S.W.2d at 269. Given the mandate from the legislature that a motion to compel arbitration be decided summarily, the supreme court held "that the trial court may summarily decide whether to compel arbitration on the basis of affidavits, pleadings, discovery, and stipulations." *Id*. Only when material facts are necessary to determine the controverted issue, by an opposing affidavit or otherwise admissible evidence, must the trial court conduct an evidentiary hearing to determine the disputed material facts. *Id*. We now consider whether there was a disputed material fact necessitating an evidentiary hearing.

## 5. Ratification of the contingency-fee agreement

As the party resisting arbitration, it was Sousa's burden to establish a defense to enforcement of the arbitration agreement. *J.M. Davidson*, 128 S.W.3d at

11

227. Though appellant challenged the referral to mediation on multiple grounds in the trial court; on appeal, Sousa argues the trial court's order was procedurally unconscionable because (1) Betty was not competent to sign the contract and (2) there was no evidentiary hearing on the matter. Sousa, in her opposition to arbitration, relied on various medical records from Betty's treating physicians arguing that Betty lacked capacity to contract in 2011. In response, the IP attorneys argue that Sousa did not successfully meet her burden to establish Betty's incapacity at the time the contingent-fee agreement was signed.[11] Regardless, the IP attorneys argue Carol Sousa ratified the contract after she became Betty's conservator.

"Ratification is the adoption or confirmation by a person with knowledge of all material facts of a prior act which did not then legally bind him and which he had the right to repudiate." *BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 196 (Tex. 2021) (quotation omitted). "Ratification extends to the entire transaction." *Land Title Co. of Dall., Inc. v. F. M. Stigler, Inc.*, 609 S.W.2d 754, 757 (Tex. 1980). Therefore, a party cannot "ratify those parts of the transaction which are beneficial and disavow those which are detrimental." *Id.* Ratification may be express—in writing—or it may be implied from a party's course of conduct and the totality of the circumstances. *BPX Operating*, 629 S.W.3d at 196. A party's subjective state of mind is immaterial to a claim of implied ratification. *Id.*

In December 2011, Sousa, acting as Betty's conservator, ratified the

---

[11] The IP attorneys attached pleadings filed in the Oregon conservatorship and probate proceedings reflecting that Betty gave power of attorney to Sousa in 2011. Further, Betty executed a will in January 2012 devising her property among her two daughters and naming Sousa as Betty's personal representative. Neither document was challenged on the basis that Betty lacked capacity.

12

agreement through an email from Dan McCarthy, her counsel, which stated the following:

> [Sousa] is fully supportive of the litigation and all efforts by all persons to date. She wants to move forward "pedal to the metal" with the litigation. Her hope is that there will be some success that Betty will live to see, and potentially enjoy. She is willing to acknowledge the fee agreement entered into by Betty. She will waive any potential conflict by/between/among all counsel, Betty, and Mr. Klinkhammer in connection with the negotiation of the fee agreement and the litigation.

The IP attorneys also provided evidence of various emails sent from Sousa's counsel to Faucett in 2012 reflecting a coordinated effort between Faucett and attorneys for the estate to seek approval from the Oregon court that had supervised Betty's conservatorship for distribution of settlement funds pursuant to the contingency-fee agreement. The evidence includes pleadings filed by Sousa, as conservator, seeking court approval for payment of attorney's fees to Clearman Prebeg, LLC n/k/a CP Windup pursuant to the contingency-fee agreement. Sousa's communications with Faucett and to the probate court do not reference any claim or dispute as to the validity of the contingency-fee agreement itself. This is notable because Sousa specifically explained in her Oregon pleadings that she had rejected claims by Klinkhammer because she believed that Klinkhammer made misrepresentations to and took advantage of Betty. The evidence reflects that Sousa and the estate benefitted financially from her ratification of the agreement. We conclude that Sousa both explicitly and implicitly through her course of conduct as conservator (and later as personal representative) ratified the contingency-fee agreement. Because the question of Betty's capacity to contract in 2007 was mooted by Sousa's ratification, there was no necessity for an evidentiary hearing on Betty's capacity to summarily determine the enforcement of the arbitration agreement.

13

Sousa disagrees that she ratified the contingency-fee agreement though she does acknowledge that she continued working with Faucett and Schwarz under the contingency-fee agreement. She argues that she had no choice and asserts duress as another defense to the enforcement of the arbitration agreement arguing her "so-called" ratification was the product of coercion and duress. Though Sousa never substantially briefed this issue in the trial court, she did provide an affidavit in response to the motion to compel arbitration stating that she was "coerced under duress" to sign the settlement and distribution agreement because she wanted to avoid an arbitration proceeding in Houston.[12] She also submitted an affidavit from her attorney Penelope McCarthy, which states that McCarthy and Sousa felt coerced into continuing to work with Faucett and his firm to avoid the threat of arbitration.

Economic duress, which is the gravamen of Sousa's defense here, must be proved with (1) a threat to do something a party has no legal right to do, (2) an illegal exaction or some fraud or deception, and (3) an imminent restraint that destroys the victim's free agency and leaves him without a present means of protection. *Wright v. Sydow*, 173 S.W.3d 534, 544 (Tex. App.—Houston [14th

---

[12] In her reply brief, Sousa claims that "[t]he issue regarding the fact that there can be no ratification without full disclosure was waived by the Appellees. The Appellees cite no case law [sic] and no facts." However, the rule she relies on for that proposition is a rule specifically addressing an appellant's brief. *See* Tex. R. App. P. 38.1. The rule addressing an appellee's brief states: "When practicable, the appellee's brief should respond to the appellant's issues or points in the order the appellant present those issue or points." Tex. R. App. P. 38.2. Our review reflects the IP attorneys complied with the requirements and did not waive any of their ratification arguments.

Sousa, in her reply brief, also claims the IP attorneys have waived "most of their arguments to Issue 2 regarding the procedural and substantive unconscionability of the contract and the arbitration and have not refuted or discussed the facts in any substantive detail." It is unclear on what basis Sousa believes the IP attorneys have waived most of their arguments. However, the briefing rules do not support Sousa's claim.

Dist.] 2004, pet. denied). There is no explanation by Sousa of why or how the request to arbitrate a dispute constitutes a threat by Faucett to do something he had no legal right to do. Nor does Sousa explain why the prospect of arbitration constituted an illegal exaction or fraud or deception. Therefore, Sousa's defense of duress does not create a dispute of material fact necessitating an evidentiary hearing. Sousa also did not refute the evidence establishing her ratification of the contingency-fee agreement. We therefore conclude the evidence of ratification of the contingency-fee agreement by Sousa supports the trial court's order compelling arbitration pursuant to the agreement between the parties.

We overrule issue 2.

## B. Trial court did not err in confirming the arbitration award

In issue 1, Sousa argues the trial court erred in affirming the arbitration award because Bergman displayed evident partiality by repeatedly failing to disclose his prior business relationship with Wilson Elser, the law firm representing the IP attorneys. In support of this argument, Sousa argues that Bergman signed a false arbitrator oath.

We review a trial court's order confirming an arbitration award under a de novo standard. *Southwinds Express Constr., LLC v. D.H. Griffin of Tex., Inc.*, 513 S.W.3d 66, 70 (Tex. App.—Houston [14th Dist.] 2016, no pet.). However, the scope of our review is "extraordinarily narrow." *Id*. We indulge every reasonable presumption in favor of upholding the arbitration award. *CVN Grp., Inc. v. Delgado*, 95 S.W.3d 234, 238 (Tex. 2002) (quoting *City of San Antonio v. McKenzie Constr. Co.*, 150 S.W.2d 989, 996 (Tex. 1941)).

### 1. Establishing evident partiality

The TAA sets out the circumstances which require a court to vacate an

arbitration award. Tex. Civ. Prac. & Rem. Code Ann. § 171.088. One of the circumstances justifying vacatur under the TAA is if the rights of a party were prejudiced by the "evident partiality of an arbitrator appointed as a neutral arbitrator."[13] Tex. Civ. Prac. & Rem. Code Ann. § 171.088(a)(2)(A); *see also Forest Oil Corp. v. El Rucio Land & Cattle Co.*, 518 S.W.3d 422, 431 (Tex. 2017). The standard for evident partiality requires vacating an award if an arbitrator "fails to disclose facts which might, to an objective observer, create a reasonable impression of the arbitrator's partiality." *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 525 (Tex. 2014) (citing *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 149 (1968), and *Burlington N. R.R. Co. v. TUCO Inc.*, 960 S.W.2d 629, 630 (Tex. 1997)).

Arbitrators are not required to be disqualified merely because of a past business relationship with a party because often the most capable arbitrators will be those with extensive experience in the industry. *TUCO*, 960 S.W.2d at 636, (*citing Commonwealth Coatings*, 393 U.S. at 150 (White, J., concurring)). Nonetheless, because the parties are entitled to at least consider the nature of those past relationships, "evident partiality is established from the nondisclosure itself, regardless of whether the nondisclosed information necessarily establishes partiality or bias." *TUCO*, 960 S.W.2d at 636 (citing *Commonwealth Coatings*, 393 U.S. at 147) (finding evident partiality based on arbitrator's failure to disclose conflict, even though there was no evidence of actual bias). Disclosure, however, is required only if facts are material; an arbitrator need not disclose "trivial" matters. *TUCO*, 960 S.W.2d at 637.

The decisions applying these rules and the outcomes themselves are case

---

[13] The same standard for determining evident partiality is applicable whether the arbitration is governed by the FAA or TAA. *Amoco D.T. Co. v. Occidental Petroleum Corp.*, 343 S.W.3d 837, 844 (Tex. App.—Houston [14th Dist.] 2011, pet. denied).

specific. In *TUCO*, for instance, the case was submitted to a panel of three arbitrators—two were "non-neutral" and one was neutral. 960 S.W.2d at 629–30. The neutral arbitrator, however, failed to disclose that three weeks before the arbitration, the law firm of one of the non-neutral arbitrators referred a substantial piece of litigation to him. *Id*. at 631. The *TUCO* court concluded this non-disclosure established evident partiality as a matter of law. *Id*.

In *Tenaska*, the arbitrator disclosed that the law firm representing one party to the arbitration had recommended him as an arbitrator in three other arbitrations, and that he was a director of a litigation services company that attended a meeting at the law firm, but there was no indication the firm and company would ever do business. 437 S.W.3d at 519–20. The arbitrator did not disclose, however, that all his contacts at the 700-lawyer firm were with the same two lawyers that represented the party to the arbitration at issue. *Id*. at 525–27. He also did not disclose that he owned stock in the litigation services company that was actively pursuing business opportunities with the firm and conducted significant marketing for that company. *Id*. He also had meetings or contacts with the two lawyers in question to solicit business from the firm for the company and he allowed one of the two lawyers to edit his disclosures in the arbitration to minimize his contacts. *Id*. The supreme court concluded the undisclosed information "might yield a reasonable impression of the arbitrator's partiality to an objective observer." *Id*. at 520.

In *Builders First Source-S. Tex., LP v. Ortiz*, this court found evident partiality based on the fact that the arbitrator was "specifically asked on the [AAA] disclosure form whether any of the law firms in the case had appeared before her in past arbitrations," in which she responded in a sworn answer, "'no' and that she had conducted a conflicts check and had nothing to disclose." 515 S.W.3d 451, 458

17

(Tex. App.—Houston [14th Dist.] 2017, pet. denied). While the arbitrator in *Ortiz* subsequently amended her disclosure to identify two arbitrations in which counsel for the respondent had appeared before her, this disclosure did not come until almost one year into the arbitration, which did not allow the petitioner an opportunity to timely object to the appointment. *Id.* at 459. We concluded the failure to disclose two prior appearances before the arbitrator by a party representative was not trivial and "might, to an objective observer, create a reasonable impression of partiality." *Id.*

Our sister court addressed a partial disclosure issue in *Las Palmas Medical Center v. Moore*, 349 S.W.3d 57 (Tex. App.—El Paso 2010, pet. denied). In *Las Palmas Medical*, the arbitrator disclosed in a letter that she had worked for clients that were both adverse to, and aligned with, clients represented by the medical center's counsel, and that she was familiar with both attorneys representing the medical center. *Id.* at 61. Just before the arbitration, the claimant's counsel also noticed that one of the medical center's attorneys was listed as a reference on the arbitrator's resume. *Id.* at 68. Unhappy with the arbitrator's decision, the claimants succeeded in having a trial court vacate the award, and referred the parties to a new arbitration before a different arbitrator. *Id.* at 63. The court of appeals, however, reversed and reinstated the award. Concluding that the mediator had disclosed her familiarity with the attorneys for the medical center and that the claimants did not investigate the matter before accepting the arbitrator's appointment, the court of appeals held the trial court erred by impliedly finding that the arbitrator "exhibited evident partiality by failing to fully disclose her relationship with counsel opposite." *Id.* at 71.

### 2. No evidence of failure to disclose

The facts of this case are not analogous to those of *TUCO*, *Tenaska,* or *Ortiz,*

18

which all involved situations of an arbitrator who did not timely disclose information that to an objective observer might create the impression of partiality. The record does not reflect a failure to timely disclose by Bergman.

On March 12, 2019, Bergman submitted his arbitrator's oath which required that he respond to a set of standard AAA questions about potential conflicts in the case. In these initial disclosures, Bergman disclosed that he previously mediated a case in which Matthew Prebeg, one of the IP attorneys, represented a party to the mediation. He also disclosed that he had mediated matters with various attorneys from the law firm of Wilson Elser including one previous matter with John Shepperd, the attorney representing the IP attorneys.

Supplemental disclosures were requested by Sousa first regarding Bergman's relationship with Alice Oliver-Parrott, the first arbitrator, and the law firm of William Kherkher Hart Boundas, LLP. A second round of supplemental disclosures were requested by Sousa seeking specific information about the number of cases in which Bergman had served as a neutral for parties represented by Wilson Elser. Bergman disclosed that he had conducted eleven mediations involving seven attorneys who were associated with Wilson Elser over a thirteen-year period from 2006 to 2019. These disclosures were made after Bergman's appointment, but before his confirmation and before any proceedings in the arbitration began. Sousa has repeatedly claimed that Bergman failed to disclose his relationship with the Wilson Elser firm.

Sousa's argument does not accurately characterize the record. Bergman, in his initial disclosures, stated he had "mediated matters with various attorneys with the law firm of [Wilson Elser] including one (1) with John Shepperd in 2016." Though Bergman did not identify specific attorneys or the number of mediations, Bergman disclosed his past business relationship and familiarity with Wilson Elser.

19

Those disclosures allowed Sousa to follow up with further requests and get more specific information about Bergman's relationship with Wilson Elser. Therefore, we conclude the trial court did not err in its implied finding that Bergman did not fail to disclose information that "might yield a reasonable impression of the arbitrator's partiality to an objective observer." *Tenaska*, 437 S.W.3d at 520.

### 3. No evidence of actual bias at the hearing

Sousa also argues that Bergman exhibited actual bias at the arbitration hearing. She argues that Bergman's hostility is corroborated by affidavits from three people working for Sheller at the final hearing[14]: (1) Chris Daniel, an attorney representing Sousa; (2) the videographer working for Sheller at the arbitration; and (3) Dale Zuehl, Sousa's fraud examiner and retained expert.[15] Sousa does not offer further briefing or argument on her complaint that Bergman allegedly exhibited evident partiality through his conduct. The IP attorneys claim Sousa waived this contention by failing to set forth clear and concise arguments in her appellate brief; we agree.[16] *See* Tex. R. App. P. 38.1(i).

Summarizing issue 1, Sousa asserts "Bergman's overt hostility is set out in 3 affidavits . . . Bergman's actions constitute evident partiality." And after devoting significant discussion to Bergman's failure to disclose, Sousa, in a single sentence, summarily addresses Bergman's conduct during the arbitration hearing: "Nevertheless, Bergman's overall conduct and ruling demonstrates evident

---

[14] The affidavit from Daniel and the videographer do not disclose or explain their relationship to David Sheller.

[15] Sousa also provided these affidavits to the trial court in her effort to oppose the confirmation of the award. However, Sousa offered no substantive discussion of the law or facts in the trial court.

[16] In response, Sousa argues the IP attorneys did not respond to the affidavits regarding Bergman's hostility and have waived those "points." Sousa does not explain which arguments she alleges the IP attorneys waived or in which court she alleges the arguments were waived.

20

partiality in this case." She offers no argument supporting her contention of evident partiality through hostile conduct at the hearing and no citation to legal authority.

Texas Rule of Appellate Procedure 38.1 requires that an appellant's brief must contain a clear and concise argument that includes appropriate citations to legal authority and the appellate record. Tex. R. App. P. 38.1(i). "This requirement is not satisfied by merely uttering brief, conclusory statements unsupported by legal citations." *Canton-Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 931 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Failure to cite legal authority or to provide substantive analysis of the legal issues presented results in waiver of the complaint. *Id.*; *see also Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–85 (Tex. 1994) (discussing "long-standing rule" that inadequate briefing waives issue on appeal). Sousa did not provide any citation to appropriate legal authority, or analysis applying the appropriate legal authority to the facts in such a manner as to demonstrate that Bergman's conduct at the arbitration constituted evident partiality justifying vacatur of the arbitration award. It is not this court's duty to review the record, research the law, and then fashion a legal argument for appellant when she has failed to do so. *See Canton-Carter*, 271 S.W.3d at 932. Therefore, we conclude that Sousa has waived the issue of Bergman's conduct at the arbitration hearing.

We overrule issue 1.

### 4.     No evidence Bergman refused to hear material evidence and allow cross-examination

In issue 3, Sousa argues the trial court erred by not vacating the arbitration award because Bergman refused to hear evidence and allow significant cross-examination in violation of the TAA. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 171.047, .088(a)(3)(C). Though Sousa asserts myriad complaints regarding

Bergman's evidentiary rulings, her complaints can be distilled into four categories: (1) complaints Bergman prevented her from getting discovery she needed; (2) complaints Bergman refused to admit all her proffered evidence; (3) complaints Bergman inappropriately allowed the use of privileged documents; and (4) complaints Bergman refused to allow significant cross-examination of the IP attorneys' expert.[17]

### a. Standard of review

The TAA provides that unless otherwise provided by the parties' agreement, a party at the hearing is entitled to: (1) be heard; (2) present evidence material to the controversy; and cross-examine witnesses. Tex. Civ. Prac. & Rem. Code Ann. § 171.047. And "[o]n application of a party, the court shall vacate an arbitrator's award if . . . the arbitrators . . . refused to hear evidence material to the controversy." *Id.* § 171.088(a)(3)(C). "An arbitrator is not bound to hear all the evidence tendered by the parties as long as each party is given an adequate opportunity to present evidence and arguments." *Kosty v. S. Shore Harbour Cmty. Ass'n, Inc.*, 226 S.W.3d 459, 463 (Tex. App.—Houston [1st Dist.] 2006, pet. denied); *see also Babcock & Wilcox Co. v. PMAC, Ltd.,* 863 S.W.2d 225, 234 (Tex. App.—Houston [14th Dist.] 1993, writ denied) (applying FAA).[18] *But see Gulf Coast Indus. Workers Union v. Exxon Co., USA*, 70 F.3d 847, 850 (5th Cir.

---

[17] In her reply brief, Sousa argues the IP attorneys waived "the majority of their arguments under Issue No. 3" and cites an inapplicable rule. *See* Tex. R. App. P. 38.1 (Appellant's Brief). We cannot discern a valid basis for waiver of arguments by the IP attorneys based on any rules or caselaw cited by Sousa.

[18] The FAA provides as a ground for vacating an award that the "arbitrators refus[ed] to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3). We conclude that this provision in the FAA is substantially similar to Civil Practice and Remedies Code section 171.088(a)(3)(C). Because the two provisions are substantially similar, cases interpreting the Federal Act constitute persuasive authority for interpreting the Texas Act. *See also Kosty*, 226 S.W.3d at 463 n.5 (reaching same conclusion).

1995) (unfair exclusion of evidence can justify vacatur of award). "An evidentiary error must be one that is not simply an error of law but which so affects the rights of a party that it may be said that he was deprived of a fair hearing." *Babcock & Wilcox*, 863 S.W.2d at 234 (quotation omitted). However, "[a]rbitrators have a great deal of discretion to exclude evidence as redundant, or otherwise unnecessary to the decision-making process." *Weinberg v. Silber*, 140 F .Supp. 2d 712, 719 (N.D. Tex. 2001), *aff'd*, 57 F. App'x 211 (5th Cir. 2003). A party seeking to vacate an arbitration award should describe the evidence that the arbitrator excluded to enable the reviewing court to determine its materiality. *See GE Commercial Distrib. Fin. Corp. v. Momentum Transp. Services, L.L.C.*, No. 09-09-00162-CV, 2009 WL 6327471, at *7 (Tex. App.—Beaumont Apr. 8, 2010, no pet.) (mem. op.).

### b. Bergman's rulings preventing discovery

As an example, Sousa argues that she was prevented from getting material information in discovery because Bergman "cancelled Klinkhammer's deposition." However, her arguments are not consistent with the record. The record reflects that Oliver-Parrott, the first arbitrator, issued an order stating Klinkhammer must be deposed *if* the parties wanted to use his affidavit. Bergman did not change her ruling, though Bergman did issue a procedural order providing a timeline for Klinkhammer's deposition, "if he agreed to be deposed." During the final hearing, Sheller told Bergman with respect to Klinkhammer: "[Y]ou didn't order them to produce Mr. Klinkhammer. There's no way to find Mr. Klinkhammer. He's been in Texas, Florida, Las Vegas, et cetera." In addition to the fact that Sheller's statement at the final hearing contradicts Sousa's appellate argument, Sousa offers no citation to the record or evidence that Klinkhammer's deposition was ever

23

specifically ordered or cancelled by either arbitrator.[19]

### c. Bergman's rulings excluding evidence

To justify vacating an arbitration award, excluded evidence must be material to the controversy. Sousa offers a long list of complaints but offers little discussion or explanation as to how the excluded evidence was material and therefore its exclusion deprived her of a fair hearing.

For example, Sousa claims that Bergman improperly refused to admit hospital records reflecting Betty's dementia. However, Sousa was able to play the deposition of Dr. Robin Hale, Betty's treating physician and the deposition of Wanda Powless, the daughter of one of Betty's friends, as well as introduce an affidavit of a specialist who treated Betty in 2011 for dementia. Sousa does not explain why the omitted records were material and not cumulative of other evidence in the record. In light of the ratification of the contingency-fee agreement by Sousa, it is unclear how evidence of Betty's mental capacity was relevant or material.

Sousa also complains that Bergman excluded the deposition of Clem Palmer, the man who introduced Klinkhammer to Schwarz as an investor. Bergman excluded the deposition on the basis that it was taken without the presence of the IP attorneys or their counsel. Sousa argues that Palmer was paid to find attorneys and not real estate and describes his deposition as necessary because only "Klinkhammer or Clem Palmer could identify certain documents such as the board meeting [sic] agreeing to pay Clem Palmer $5,000 to find attorneys to finance the litigation." Bergman did allow Sousa to make an offer of proof and portions of Palmer's deposition were offered and recorded in the transcript; however, those

---

[19] Sousa also does not argue that Klinkhammer was a party or subject to the control of any party.

portions of Palmer's deposition generally do not support Sousa's contentions. Sousa never explains how the testimony given by Palmer was material to her claims, nor does she make clear which claims the testimony was needed to support. In his deposition, Palmer never directly testifies about any conversations with any of the IP attorneys. He confirms he was paid a finder's fee pursuant to his agreement with Klinkhammer; however, Sousa never connects the dots linking that testimony causally to any of her claims.

Similarly, Sousa complains that Klinkhammer's deposition was needed to admit or authenticate a variety of exhibits proffered by her for the proposition that Klinkhammer was using the Wilwerding processor as collateral for loans without the knowledge of Betty or her estate. However, Sousa offers only citations to the prehearing proceeding in which the arbitrator receives objections to these documents from the IP attorneys but does not rule on the objections. The documents in dispute are included in the exhibits from the arbitration hearing, which were filed in the trial court. If the documents proffered by Sousa were excluded, she offers no citations to the record evidencing the exclusion. Further, even if the documents were excluded, Sousa does not explain to this court why the documents were material to any of her claims against the IP attorneys.

In any event, the record establishes that the arbitrator conducted a weeklong hearing during which hundreds of exhibits were introduced and a number of witnesses testified, either live or via deposition. Both parties were able to present evidence and make arguments. Though Sousa disagrees with some of the exclusionary rulings and the ultimate decision of the arbitrator, the record reflects that Sousa was given an adequate opportunity to present evidence and argument. Sousa has not shown the arbitrator failed to give her an opportunity to present evidence and arguments. *See Fogal v. Stature Const., Inc.*, 294 S.W.3d 708, 721

(Tex. App.—Houston [1st Dist.] 2009, pet. denied). Sousa did not establish the materiality of the information she complains was excluded to her claims against the IP attorneys. Therefore, we cannot conclude that the arbitrator's ruling deprived Sousa of a fundamentally fair hearing. *See Las Palmas Med. Ctr.*, 349 S.W.3d at 72–73.

### d. Complaints Bergman inappropriately allowed the use of privileged documents

Sousa also argues that Oliver-Parrott inappropriately required the production of the entire file between attorneys Dan McCarthy and Penelope McCarthy and their client, Sousa. Bergman did not reverse this ruling despite at least one request from Sousa. On appeal, Sousa argues she was prejudiced by the production of this attorney-client file and, as proof, cites to the arbitration award which quotes an email from Sousa to Dan McCarthy memorializing her intent to sue Faucett after the conclusion of the trade-secret litigation.[20] The IP attorneys argue the disclosure of the McCarthys's attorney-communication file was necessary to their counterclaims and appropriate because Sousa was offensively using the affidavit(s) from Penelope McCarthy including McCarthy's opinion "as to virtually everything at issue in the arbitration." The IP attorneys also argue that Sousa did not preserve error on the issue because she did not make any objection at the hearing as to any privileged documents. We disagree that Sousa did not preserve her objection as she repeatedly raised the issue in pre-hearing proceedings as well as during the final hearing and received an adverse ruling. *See* Tex. R. App. P. 33.1.

Sousa admits in her appellate reply that she engaged in a partial waiver of

---

[20] The arbitration award quotes the following email from Sousa to the McCarthys regarding her decision to sign the Distribution ad Settlement agreement in 2012:

> "I have no problem signing it as I know that I can get him later through ethics as Callahan even stated upon reviewing a few docs as we discussed or a legal malpractice attorney."

privilege by releasing communications between McCarthy and herself to establish she did not want to sign the settlement and distribution agreement. Though Sousa claims there was nothing confidential in the emails she released, McCarthy's affidavit discusses her dealings and communication with Faucett. None of the parties cite to any briefing or argument in the record before Oliver-Parrott, though the order compelling Sousa to produce the "McCarthy Law Office File" is in the record.

"The attorney-client privilege holds a special place among privileges: it is the oldest and most venerated of the common law privileges of confidential communications." *Paxton v. City of Dallas*, 509 S.W.3d 247, 259 (Tex. 2017) (internal quotations omitted). However, the law does recognize some limitations. First, the Texas Rules of Evidence recognize that if a party makes an intentional and voluntary disclosure of confidential communications, the waiver may extend to undisclosed communication or information if: (1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness be considered together. *See* Tex. R. Evid. 511(b)(1). The supreme court has also recognized that if a claimant attempts to use the privilege as a sword rather than a shield, the privilege may be waived. *Republic Ins. Co. v. Davis*, 856 S.W.2d 158, 163 (Tex. 1993). Here, the IP attorneys asserted claims of fraud and fraudulent inducement, breach of contract, conspiracy to commit fraud, and aiding and abetting fraud for inducing the attorneys to complete the trade-secret litigation based on Sousa's representations that she was in agreement with the work performed by the attorneys and willing to waive any conflicts.

To vacate the arbitration award, Sousa must show the arbitrator prejudiced her rights by "misconduct or wilful misbehavior" or that the arbitrator conducted

27

the hearing "in a manner that substantially prejudiced the rights of a party." Tex. Civ. Prac. & Rem. Code Ann. § 171.088(2)(C), (3)(D). Because of the nature of the claims asserted against Sousa in combination with her voluntary, partial waiver of the privilege, we cannot conclude the ruling compelling the production of the McCarthy file precluded a fair hearing for Sousa. These rulings do not establish evidence of misconduct, willful behavior or conduct on the part of Oliver-Parrott, or Bergman that substantially prejudiced Sousa's rights. *See id.*

Absent those considerations, our appellate review of an arbitration award is very narrow and deferential. Even a legal error on the part of the arbitrator is not sufficient to vacate an award. *See Forest Oil Corp.*, 446 S.W.3d at 81. Therefore, we conclude the trial court did not err in confirming, and not vacating, the arbitration award on the basis that the admission of documents from the McCarthy's case file justified vacatur of the award.

### e. Bergman's rulings with respect to expert witness

Sousa also claims that Bergman refused to allow cross-examination of the IP attorneys' expert, Gwen Richard, or strike her. The record does not support these contentions. Bergman heard a motion to strike from Sousa, which was denied. Sousa then had the opportunity to cross-examine the expert witness. Therefore, we conclude Sousa's argument that Bergman refused to allow significant cross-examination of Richard in violation of Civil Practice and Remedies Code section 171.047 is without merit.

Sousa also complains that Bergman limited all expert testimony to the substance in the expert report because the expert reports were submitted before some of the depositions in the case were concluded. However, this restriction applied equally to both sides and Sousa fails to explain how the opinions of her expert(s) changed after the later depositions and what argument or evidence she

28

was unable to present at the final hearing as a result.

We overrule issue 3.

### 5. Arbitration award of attorney's fees to IP attorneys

In issue 4, Sousa argues the trial court erred in confirming the arbitration award because the arbitrator improperly awarded attorney's fees to the IP attorneys. Specifically, Sousa argues the award violates the TAA because there is no attorney's fees provision in the contingency-fee agreement nor does the law allow recovery of attorney's fees for the causes of action asserted. In response, the IP attorneys argue they were entitled to recovery of their attorney's fees under several different theories, including that they were entitled to recover attorney's fees as prevailing parties under the DTPA and TTLA.

Though Sousa does not specifically reference any provision of the TAA requiring vacatur, the TAA requires vacatur of an arbitration award if the arbitrator exceeded his powers, which is the gravamen of Sousa's complaint regarding the award of attorney's fees. *See* Tex. Civ. Prac. & Rem. Code Ann. § 171.088(a)(3)(A). The TAA also provides that an arbitrator shall award attorney's fees as additional sums required to be paid under the award only if the fees are provided for in the agreement to arbitrate; or by law for a recovery in a civil action in the district court on a cause of action which any part of the award is based. Tex. Civ. Prac. & Rem. Code Ann. § 171.048(c)(1), (2).

"In arbitration conducted by agreement of the parties, the rule is well established that an arbitrator derives his power from the parties' agreement to submit to arbitration." *Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 89–91 (Tex. 2011) (quotation omitted). As with any contract, the parties' intentions control, and "courts and arbitrators must give effect to the contractual rights and expectations of

the parties." *Id*. (citation omitted). However, an arbitrator does not exceed his authority simply because he may have misinterpreted the contract or misapplied the law. *See D.R. Horton-Tex., Ltd. v. Bernhard*, 423 S.W.3d 532, 534 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "Thus, the appropriate inquiry is not whether the arbitrator decided an issue correctly, but instead whether she had the authority to decide the issue at all." *Id*. (citation omitted).

Sousa does not dispute that the issue of attorney's fees was properly before the arbitrator. In the arbitration award, Bergman determined that Sousa should take nothing by her claims, and that CP Windup and Schwarz proved their claims of fraud and fraudulent inducement, breach of contract, conspiracy to commit fraud, and aiding and abetting fraud. Bergman awarded attorney's fees, costs, and expenses to all the IP attorneys. Though Sousa argues the IP attorneys actually lost on the TTLA claims, the arbitration award specifically states Sousa did not prove her TTLA claims. As prevailing parties, the IP attorneys were entitled to receive attorney's fees for the defense of those claims. The award explains that "virtually all claims are predicated upon the alleged 'thefts'" of the IP attorneys and "inextricably intertwined with [Sousa's] other causes of action" such that the IP attorneys had no obligation to segregate attorney's fees among the various claims. Therefore, the arbitrator concluded the entirety of the IP attorney's fees should be awarded as part of their mandatory fees and costs.

We need not decide whether Bergman made the proper decision, but rather that the matter was properly before Bergman. The contract between the parties provides that "[a]ny controversy arising out of, or relating to, this agreement . . . will be settled by binding arbitration in Harris County, Texas, according to the rules and regulations of the American Arbitration Association." The parties' agreement included the apportionment of fees and costs under AAA rules, which

state that an award may include "an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement." *See* Commercial Arbitration Rules of the American Arbitration Association, Rule R–47(d)(ii). All parties requested attorney's fees. Further, the arbitration award identifies Sousa's active claims in the arbitration matter, which include alleged DTPA and TTLA violations. The issue of attorney's fees was clearly submitted to the arbitrator, and the arbitrator consulted the contractual provisions and statutes regarding attorney's fees when reaching his conclusion. Under these circumstances, we cannot conclude that the arbitrator exceeded his authority by awarding attorney's fees. *Bernhard*, 423 S.W.3d at 535; *see also IQ Holdings, Inc. v. Villa D'Este Condo. Owner's Ass'n, Inc.*, 509 S.W.3d 367, 373 (Tex. App.— Houston [1st Dist.] 2014, no pet.) (court "may not vacate an award on the grounds that the arbitrator exceeded her powers even if the award is based upon a mistake in law or fact") (citing *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013)).

We overrule issue 4.

### 6. Settlement proceeds "given in settlement by Scott Clearman"

In issue 5, Sousa argues that the trial court erred in denying her motion for new trial, without hearing, on the grounds she was entitled to Scott Clearman's portion of the attorney's fees stemming from one of the settlement amounts received by the IP attorneys. Sousa argues that her Fourteenth Amendment due-process rights were violated by the trial court's alleged error, as well her right to be heard under the Texas Constitution's open courts provision. U.S. Const. amend. XIV; Tex. Const. art. I, §13.

During the underlying litigation, Sousa settled with Scott Clearman, formerly a partner of Clearman Prebeg, LLC n/k/a CP Windup, who agreed Sousa

would be entitled to receive his portion of the attorney's fees received by Clearman Prebeg, LLC, by virtue of his partnership interest, from a settlement with Efficien Technology, LLC, a company affiliated with the Texas Licensees. Clearman believed he was entitled to some portion of the attorney's fees from the Efficien settlement, though they had not been paid to Clearman. Therefore, Sousa claimed she was entitled to 25% of "the award owed to Clearman Windup."[21] In her motion for new trial, Sousa argued that the arbitration award is "totally deficient" because it does not set out the award to CP Windup or address Sousa's request for a declaratory judgment. Sousa's motion devotes two sentences to this issue, offers no further context or explanation and does not discuss whether the issue or declaratory judgment was ever submitted to or considered by the arbitrator. Sousa's motion for new trial offered no citations to the record or evidence supporting this argument.

We conclude that Sousa did not preserve error on this issue as she did not make her request to the trial court with sufficient specificity to make the trial court aware of her complaint where the specific grounds were not apparent from the context.[22] Tex. R. App. P. 33.1(a). Therefore, we do not address the merits of this issue.

---

[21] Clearman was a party in the trial court, though he was not compelled to arbitration.

[22] Sousa argues that she has the right to bring this argument on appeal pursuant to Texas Rule of Appellate Procedure 33.1(d), which allows complaints of legal or factual insufficiency of the evidence to be raised for the first time on appeal. Tex. R. App. P. 33.1(d). However, as raised in the briefing, issue 5 is not a factual- or legal-sufficiency issue.

### III. CONCLUSION

Having overruled issues 1–4 and concluded issue 5 was not preserved for appellate review, we affirm the judgment of the trial court as challenged on appeal.


/s/     Charles A. Spain
           Justice

Panel consists of Justices Wise, Spain, and Hassan.